1　　　　　　　　**UNITED STATES JUDICIAL PANEL**

2　　　　　　　　　　　　　　**on**

3　　　　　　　　**MULTIDISTRICT LITIGATION**

4

5　MDL NO. 2492　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　**ORAL ARGUMENT**
6　In Re:　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
7　National Collegiate Athletic　)
　　Association Student-Athlete　)
8　Concussion Injury Litigation,　)
　　　　　　　　　　　　　　　　　)　　　**O R I G I N A L**
9　_____)

10

11　　　　　Lloyd D. George United States Courthouse
　　　　　　　　　Courtroom 7C, 7th Floor
12　　　　　　333 Las Vegas Boulevard South
　　　　　　　　　Las Vegas, Nevada 89101
13

14　　　　　　Thursday, December 5, 2013

15　　　　　　　1:35 p.m. - 2:17 p.m.

16

17　**Panel Members:**

18　Chairman:　　　　　　Honorable John G. Heyburn, II

19　Members:　　　　　　Honorable Sarah S. Vance

20　　　　　　　　　　　Honorable Paul J. Barbadoro

21　　　　　　　　　　　Honorable Charles R. Breyer

22　　　　　　　　　　　Honorable Ellen S. Huvelle

23　　　　　　　　　　　Honorable Lewis A. Kaplan

24

25　Court Reporter:　Ellen L. Ford, CRR, RPR, CCR #846

**ORAL ARGUMENT:**

**By:**      Elizabeth A. Fegan, Esq.
            Hagens Berman, LLP
**For:**     Adrian Arrington, et al.

**By:**      Mark S. Mester, Esq.
            Latham & Watkins, LLP
**For:**     National Collegiate Athletic Association

**By:**      Roger W. Orlando, Esq.
            The Orlando Firm, P.C.
**For:**     Jerry Caldwell, et al.

**By:**      David Franco, Esq.
            The Dugan Law Firm
**For:**     John DuRocher, et al.

**By:**      Richard S. Lewis, Esq.
            Hausfeld, LLP
**For:**     Chris Walker, et al.

**By:**      Paul G. Cereghini, Esq.
            Bowman & Brooke, LLP
**For:**     Riddell, Inc., et al

**By:**      C. Scott Toomey, Esq.
            Littleton Joyce Ughetta Park & Kelly, LLP
**For:**     Kranos Corporation d/b/a Schutt Sports

1    **Las Vegas, Nevada; Thursday, December 5, 2013; 1:35 p.m.**

2                              --o0o--

3                      **P R O C E E D I N G S**

4        COURT CLERK:  The Panel is now in session.  You may be

5    seated.

6        CHAIRMAN HEYBURN:  All right.  Thank you for waiting

7    on us.  I hope it's reasonably convenient at least to know when

8    you're going to argue.  It seemed to us that was better than

9    having it be up in the air, so I hope this worked out all right

10   for you all.

11       All right.  This 2492.  NCAA Student-Athlete

12   Concussion Injury Litigation.

13       We have a number of different -- seven different

14   arguments.  Miss Fegan.

15       MS. FEGAN:  Good afternoon, Your Honors.  Elizabeth

16   Fegan on behalf of the Arrington Plaintiffs.  We filed a case

17   in the Northern District of Illinois and are seeking

18   centralization or coordination there before Judge Lee.

19       Prior to September of this year, there were two cases

20   pending in the Northern District of Illinois.  Those were

21   consolidated pursuant to local rule.  Both were filed on behalf

22   of student athletes that had suffered concussions or injury

23   from subconcussive hits.

24       Lead counsel has been appointed in that case, both my

25   firm, as well as Mr. Seger's firm, and we've expended nearly

1 8,000 hours conducting discovery, reviewing documents,

2 conducting depositions, working with our experts.

3       We filed a motion for class certification in July of

4 this year.  That's supported by a 100-page expert report.  It's

5 supported by --

6       CHAIRMAN HEYBURN:  Is the class consisting of those

7 actually -- allegedly injured -- who have an injury of some

8 sort?

9       MS. FEGAN:  We filed on behalf of student athletes in

10 a number of contact sports; so things like football, soccer,

11 lacrosse, wrestling.

12       CHAIRMAN HEYBURN:  But these are people who actually

13 have an injury of some kind, or just any -- all participants?

14       MS. FEGAN:  Our class is on behalf of all participants

15 in those contact sports.  Because by being a participant in

16 that contact sport, you are at risk for a latent injury --

17 either a current injury or latent injury -- and we believe that

18 medical monitoring is an appropriate remedy for those student

19 athletes.

20       Since we filed our motion for class certification, two

21 events have occurred; first, there was a settlement announced

22 in the NFL Concussion Litigation, and second, we publicly asked

23 Judge Lee for a stay of our case pending mediation the parties

24 agreed to.

25       Upon the announcement of those two events, nine

additional class actions have been filed on behalf of student athletes that have suffered concussions. In addition, there's --

CHAIRMAN HEYBURN: I'm sorry. So is that different with your case?

MS. FEGAN: No, we don't believe it is. In fact, we --

CHAIRMAN HEYBURN: But those are on behalf of people that have concussions, and your case is all participants.

MS. FEGAN: No. Actually, most of those are on behalf of football players, so a subset of the class in which we have filed.

There's also a petition to intervene pending in Chicago on behalf of the purported personal injury class action seeking to intervene in our case. That particular case is not before this Court because they've chosen to go the route of intervention.

So we have what now is a situation where we have filed a petition to intervene in the first case that was filed in Tennessee. The reason we did that is because counsel there filed immediately a motion for appointment as lead counsel, even though we've already been appointed as lead counsel.

They also filed three different requests for expedited or emergency relief to participate in our mediation, despite the fact that they haven't been pending and done the work that

1   we had done.

2          We are now in a situation where it is appropriate for

3   Judge Lee in the Northern District to either decide our motion

4   for class certification, for us to finish the prosecution of

5   that matter, or for us to complete the resolution process in

6   the mediation that we're currently involved in with the NCAA.

7          It makes little sense for us to be spending our time

8   and resources going to each of these other Districts, filing

9   petitions to intervene, and filing Section 1404 motions to have

10  those cases stayed, transferred, or dismissed, which is what we

11  currently have pending in Tennessee.

12         Because of the overlap between each of these cases,

13  there's five important things there are overlapped:

14         They are all on behalf of NCAA student athletes, all

15  on behalf of student athletes that may have suffered

16  concussions or injury from subconcussive hits, all about

17  whether the NCAA knew of the dangers of the concussion, all

18  about the NCAA's failure to implement proper concussion

19  management standards, and all about medical monitoring.

20         JUDGE BARBADORO:  What do you say to the arguments

21  about the helmet manufacturers, that they be dealt with

22  separately?

23         MS. FEGAN:  I think the appropriate -- we do not have

24  a claim against the helmet manufacturers.  That being said, I

25  think the Panel appropriately handled it in the NFL case and

ruled that they would initially transfer those claims to the MDL and let the Transferee Judge decide whether they should remain there or whether it was an overlap. I think that was an appropriate --

JUDGE VANCE: Are those product liability claims?

MS. FEGAN: I believe that they are product liability claims.

CHAIRMAN HEYBURN: Did the NFL settlement involve the helmet manufacturers?

MS. FEGAN: From what I understand from the public announcement, that the helmet manufacturers have not settled or agreed to settlement there.

I believe I reserved one minute for rebuttal, so at this point, I just ask for centralization and consolidation in the Northern District of Illinois. Thank you.

CHAIRMAN HEYBURN: Mr. Mester.

MR. MESTER: Good afternoon. Mark Mester representing the NCAA. We're a party in all 11 of the pending class actions now before the Panel. And as we indicated in our moving papers -- or our papers, we support transfer/consolidation in the Northern District of Illinois before Judge Lee.

I was last before this Panel in May on the occasion of Judge Ferguson's retirement from the Panel, and there was a lot of discussion at that hearing about the value of having a single Sheriff. I think this is a situation where we really do

1  need a single Sheriff.

2       CHAIRMAN HEYBURN:  It's a Ranger.  One riot, one

3  Ranger.

4       MR. MESTER:  I had a long discussion with a colleague

5  of mine.  She's going to get an earful when I get back in my

6  office.  That was my recollection, as well.  She swore I was

7  wrong.

8       In any event, Ranger --

9       CHAIRMAN HEYBURN:  Your point is the same.

10      MR. MESTER:  -- Ranger or Sheriff, we really do

11 believe that this is a --

12      JUDGE BREYER:  Well, in Texas, it's a Ranger.

13      MR. MESTER:  We need a Judge to make important

14 threshold determinations on issues that are otherwise going to,

15 I think, consume an enormous amount of time and effort and need

16 to -- and I'm concerned -- confusion on a variety of different

17 fronts, not the least of which being members of the proposed

18 classes, the definition of the proposed classes, run the gamut.

19      If I were a class member, I wouldn't know where my

20 interests were being represented or by whom.  As counsel in

21 Arrington indicated, there has already been a lead counsel

22 appointed, but there's other people seeking to be appointed in

23 other cases.  So we really believe that --

24      JUDGE BARBADORO:  Does it make sense to have multiple

25 sports being handled in the same MDL?

1      MR. MESTER:  I think it does, Your Honor.  The

2  broadest class definition is actually the class definition

3  which we believe is the operative one and inherent to the

4  Second Amended Complaint, and we do think it makes sense to

5  have them all in one spot.

6      JUDGE BARBADORO:  And do you have a view on the issue

7  of whether helmet manufacturers can be handled in the same MDL?

8      MR. MESTER:  We do, Your Honor.  We have an

9  affirmative defense in the cases with regard to joinder

10 interaction be adjudicated on a class basis.  There's a large

11 number of entities and people that need to be there, the helmet

12 manufacturers would be among them.

13      Having said that, we believe that the best solution is

14 to allow for the Transferee Judge to make the decision on

15 severance of that, and that is the intention of the helmet

16 manufacturers.

17      CHAIRMAN HEYBURN:  All right.  Thank you very much.

18 Mr. Orlando.

19      MR. ORLANDO:  Good afternoon, Judges.  I'm Roger

20 Orlando from Atlanta.  I represent 43 named Plaintiffs in the

21 Caldwell case presently filed in the Northern District of

22 Georgia, and before Senior Judge Charles Pannell there.

23      Everyone in this Panel is already familiar with the

24 wonderful Atlanta airport, things of that nature, so I won't

25 bore you with those things.

1    What I urge you to consider in making the decision to
2 consolidate and transfer, we believe appropriately to the
3 Northern District of Georgia, is the convenience to the
4 majority of the witnesses that would be involved in this type
5 of case.
6    Both the Arrington Plaintiffs in several pleadings and
7 the NCAA themselves in publications all reference the CDC,
8 which is headquartered, as you know, in Atlanta.  The CDC is on
9 the forefront of the medicine and policy with regard to
10 concussive injuries and has a concussion brain center in
11 Atlanta.
12    As a sidenote, if Atlanta were not appropriate, the
13 Northern District of Georgia, other witnesses would be the
14 NCAA, which is found in Indiana, and then that would be my
15 second choice, and would urge the Court, if consolidation is
16 appropriate, which we believe it is, but you do not agree with
17 the Northern District of Georgia, then Indiana would be
18 appropriate.
19    Although I believe it an omen that the NCAA Hall of
20 Fame is about to open in Atlanta, and I think that would work.
21    CHAIRMAN HEYBURN:  Maybe you'll be in it.
22    MR. ORLANDO:  No, not me.  Oh, yes.  I'll be the
23 doorman.
24    In my remaining few seconds, Judge Pannell has a lot
25 of experience as a Senior Judge there.  I am authorized to

1  state that, "He finds this case very interesting and would

2  be -- happily accept consolidation within his Court."

3      CHAIRMAN HEYBURN:  Well, he can join the line of other

4  judges who would say the same thing.

5      MR. ORLANDO:  Thank you.

6      CHAIRMAN HEYBURN:  Thank you.  Let's see here.

7  Mr. Franco.

8      MR. FRANCO:  Good afternoon, Your Honors.  David

9  Franco on behalf of the DuRocher Plaintiffs.

10      As more fully addressed in our briefing, we oppose

11  consolidation.  While there are admittedly some overlaps in the

12  facts and claims alleged by the respective parties, our case is

13  a little different because it does include the helmet

14  manufacturer Riddell and Kranos, d/b/a Schutt Sports.  It also

15  alleges some additional claims that are a little broader in

16  scope.

17      All of the actions here today, we believe, involve

18  different classes across different states, that bring different

19  claims and different sports against a different set of

20  Defendants.

21      However, should the Panel favor consolidation, I would

22  like to highlight why the Southern District of Indiana is the

23  most appropriate Transferee Court.

24      The NCAA is headquartered in Indianapolis.  It is a

25  convenient location for all parties.  It is very centrally

located.  Currently, the District has one MDL pending, versus
16 pending MDLs in the Northern District of Illinois.  And as
this Panel has previously recognized, the Southern District of
Indiana is well-equipped, experienced, and has the necessary
tools for managing MDLs.

I would also like to note that Judge Sarah Barker is
currently presiding over the DuRocher action, and this Panel
has also previously recognized her experience successfully
handling in an efficient manner five MDLs.

For all of these reasons, the DuRocher Complainants
oppose consolidation or, in the alternative, request transfer
to the Southern District of Indiana.

Thank you for your time.  I'd be happy to take any
questions in my few moments that are left.

CHAIRMAN HEYBURN:  Thank you very much.

MR. FRANCO:  Thank you.

CHAIRMAN HEYBURN:  Mr. Lewis.

MR. LEWIS:  Good afternoon, Your Honors.  Richard
Lewis on behalf of the Walker Plaintiffs in the Eastern
District of Tennessee.  And I've been authorized to speak for
the Dowden, Morgan, Walton, and Washington case in my comments
today.

I'd like to address -- we support the Southern
District of Indiana.  When we first filed our papers there were
only three cases, but now there's a different situation.  I'd

like to get to the fundamental issue raised by the Arrington

argument.

Arrington argues that their case is so advanced that
Northern District of Illinois should be the location for the
consolidated proceeding. But I'd like to point out from the
record -- for the record that, first of all, there's a class
brief filed, there's no response to that class brief, and
there's a stay in that case.

But more importantly, in that class brief, the
Arrington Plaintiffs deal with the fundamental issue in this
case, which is medical monitoring for a class of former college
athletes. And what they say is, the only athletes that should
be included in that medical monitoring program played football
or other college contact sports after 2004.

And it's fundamentally important to all the other
Plaintiff cases that have been filed who seek to represent
those players in addition to the players who played before
2004, that this important difference be discussed before the
Court.

The players who played before 2004 are obviously
older. They are more at risk to the kind of injuries at issue
in this case. And most importantly, they have a more immediate
need for the medical monitoring.

JUDGE BARBADORO: But isn't that an issue that
ultimately the Transferee Judge would oversee the filing of the

consolidated Amended Class Action Complaint, and those issues

would be taken up in accordance with the filing of that Amended

Complaint?

MR. LEWIS:  Absolutely, Your Honor.  My only point is,

when Arrington says they're so advanced, they've done important

work in Chicago, but what needs to be made clear is they have

excluded tens of thousands --

CHAIRMAN HEYBURN:  So if what you say is true, then

what would be some precedential basis that we would pick among

all these judges and all these sites and all the locations?  I

mean, why -- I mean, Sarah Barker's a great judge, Judge Lee is

a good judge --

MR. LEWIS:  Yes, Your Honor.

CHAIRMAN HEYBURN:  -- so --

MR. LEWIS:  My only point is, that whatever judge is

assigned this litigation, there's a lot of new work, new

discovery, new experts, new briefing that has not been done

yet.  So --

JUDGE BREYER:  So really, you're saying there's not a

leg up in the sense of getting it to Illinois.

MR. LEWIS:  Exactly.

CHAIRMAN HEYBURN:  In essence, it could go anywhere.

MR. LEWIS:  Exactly.  Because a lot of new work --

CHAIRMAN HEYBURN:  (inaudible) Clarksburg.

MR. LEWIS:  Yes.

1          CHAIRMAN HEYBURN:  Maybe you weren't here earlier.

2          MR. LEWIS:  We support the Southern District of

3    Indiana for the reasons the DuRocher counsel mentioned, but all

4    of the courts are obviously able to handle this.  But what's

5    important is that the class that the Arrington Plaintiffs seek

6    to certify for medical monitoring purposes excludes the

7    majority of the class that all the rest of the Plaintiffs'

8    counsel seek to represent.

9          CHAIRMAN HEYBURN:  But I want to point out, that's

10   going to be -- assuming that this case is centralized

11   someplace, then unless the Transferee Judge simply decides that

12   certain claims are simply inconsistent with the overall

13   litigation or should be decided separately someplace -- and

14   there's going to be an Amended Consolidated Complaint, it's

15   going to take into account these very issues -- no one's -- no

16   one's going to be left out of the Illinois case or left out of

17   Indiana simply because the original Complaint didn't assert

18   those claims.

19         MR. LEWIS:  Yes, Your Honor.  If I could have five

20   seconds to answer.  That is our major --

21         CHAIRMAN HEYBURN:  You can have more than five

22   seconds.

23         MR. LEWIS:  That is our major concern.  That the

24   players from prior to 2004 who are not in the medical

25   monitoring definition in Arrington be included in this case

1  wherever it's consolidated.

2          CHAIRMAN HEYBURN:  Okay.  Fair enough.

3          MR. LEWIS:  Thank you, Your Honor.

4          CHAIRMAN HEYBURN:  All right.  Let's see.  We have --

5  I won't try to pronounce your last name.  Paul.

6          MR. CEREGHINI:  Cereghini, Your Honor.  Good

7  afternoon, Your Honor.  Your Honor, this is Paul Cereghini on

8  behalf of the Riddell Defendants.

9          We've got 10 cases pending now, so we recognize that

10 the Panel may decide to centralize the NCAA-only matters.  But

11 if the Panel centralizes them, we're asking that the claims

12 against Riddell and the other helmet manufacturer, that's

13 Kranos, be separated and remanded by the Panel.

14         The Arrington matter has been proceeding now for, you

15 know, we've heard approximately two years.  So the other

16 NCAA-only matters, arguably, arguably, can be folded into that

17 litigation like cars on a highway on-ramp.  But looking at

18 Kranos and Riddell, that is certainly not the case.  You'd have

19 to build another highway, and maybe you'd have to build two

20 highways to accommodate the litigation and the claims against

21 us.

22         The Arrington Plaintiffs, and the other parties in

23 Arrington, even though that matter has been pending for

24 approximately two years, have not made any claims against

25 Riddell or against Kranos.  There's not product liability

1 claims at all.

2       CHAIRMAN HEYBURN: But isn't -- going back to the
3 reality of the situation. Wherever we -- if we choose to
4 centralize, then the judge is going to be looking at all the
5 claims. For instance, the NCAA has already said, even though
6 they have no claims against your company now, in the overall
7 litigation they may seek to assert them. So even though your
8 company is only in a limited number of the actions now, it's
9 not inconceivable that they would be made a part of the overall
10 litigation.

11       Now, whether or not -- and there could be separate
12 litigation tracks. Obviously, the question of your liability
13 is somewhat attenuated from others, but that would be resolved
14 in due course, I suppose.

15       MR. CEREGHINI: Well, no. We don't think that would
16 be efficient. We don't -- we think it would be very
17 inconvenient. We think it would require that the Court develop
18 these separate tracks, highways, through different actions.
19 We're talking about product liability actions versus the
20 negligence and breach of contract actions.

21       But also, Your Honor, we're involved in only one case
22 now. So the situation --

23       CHAIRMAN HEYBURN: Which case is that?

24       MR. CEREGHINI: That's the DuRocher matter.

25       CHAIRMAN HEYBURN: Which -- in what court is that?

1        MR. CEREGHINI:  That's the Southern District of

2  Indiana.

3        CHAIRMAN HEYBURN:  Oh, right.

4        MR. CEREGHINI:  And if I can, I'd like to

5  differentiate where we are now compared to where we were two

6  years ago when I appeared before the Panel with respect to the

7  NFL MDL motion that was pending at that time.

8        At that time, there were multiple cases pending

9  against Riddell.  That's not the situation here.  There's only

10 one.  There were allegations in the NFL litigation about

11 concerted conduct, of conspiracy, of collaboration between the

12 NFL and the -- and Riddell.  But those type of allegations

13 haven't been made here, they're not made in DuRocher, and

14 DuRocher is the only matter.

15       Both the NFL and Riddell had pending preemption

16 motions at the time that we appeared before the Panel.  That's

17 not the situation here.

18       The NFL MDL in that litigation doesn't involve women's

19 sports, it doesn't involve field hockey, soccer, lacrosse, it

20 doesn't involve ice hockey, it doesn't involve wrestling.

21       The Panel's transfer order of January 31, 2012,

22 establishes why transfer here of the claims against Riddell and

23 Kranos would be inappropriate.  There, the Panel pointed out

24 that there were multiple actions against Riddell.  That's not

25 the case here, there's only one.  The Panel pointed out that

the -- Riddell was already defending a case in what became the

Transferee District.

JUDGE BREYER:  Could I ask a question?

MR. CEREGHINI:  Yes.

JUDGE BREYER:  If, in fact, we centralize in the

Southern District of Indiana, where you are right now --

MR. CEREGHINI:  We are.

JUDGE BREYER:  -- okay, how would you be prejudiced by

that?

MR. CEREGHINI:  Well, because the Court is then going

to have to step back and get the -- get its hands around the

totality of the action, it's going to have to deal with

scheduling, it's going to have to fit us into --

JUDGE BREYER:  Well, I mean, that's called a separate

track, isn't it?  I mean, if you -- we're talking -- are you in

front of Judge Barker?

MR. CEREGHINI:  Yes, that's correct, Your Honor.

JUDGE BREYER:  Well, okay.  So she's had all this

experience in this area with your case.

MR. CEREGHINI:  Right.

JUDGE BREYER:  Why then are you prejudiced if, in

fact, she gets more things to do given what she knows about

your case?

MR. CEREGHINI:  Well, it really goes to the second

point in this Panel's order dealing with the NFL MDL where the

1 Panel said it's unclear at this juncture how closely related

2 the claims against the Riddell Defendants are to the claims

3 against the NFL.  Here, we think it's clear.

4         JUDGE BREYER:  And your view is that they're not; is

5 that right?

6         MR. CEREGHINI:  Here, it's clear.  And we think

7 that --

8         JUDGE BREYER:  So if she's convinced that you're

9 right, it won't have any impact on you, will it?

10         MR. CEREGHINI:  Well, other than we think this issue

11 is ripe for decision now by this Panel as opposed to being

12 deferred for decision by the Transferee Judge.

13         JUDGE VANCE:  Is it your contention that you would

14 have to participate in MDL activities that you would not have

15 to participate in otherwise?

16         MR. CEREGHINI:  Well, absolutely.  And discovery

17 activities, and motion activities, and -- the other parties,

18 the Arrington Plaintiffs, have seen it appropriate -- and the

19 NCAA for that matter -- to proceed for two years and to get to

20 the point where they are, including in whatever stage of

21 mediation they are without any helmet manufacturer whatsoever.

22         And to answer one other question that was asked

23 earlier.  Riddell was the only helmet manufacturer in the NFL

24 litigation, so that is different.  But also, Riddell is not a

25 party to the settlement.

1        CHAIRMAN HEYBURN:  So how does that actually -- so

2   that seems, in the overall scheme, that's worked out -- you

3   know, no one's forced you to settle in the NFL case, and you

4   didn't, and now the claims against you will be dropped or

5   proceeded with, I suppose, right?

6        MR. CEREGHINI:  Well, we were here two years ago.

7   So --

8        JUDGE VANCE:  Does that increase your costs of

9   defense?  Is that --

10       MR. CEREGHINI:  Well, yes, it certainly does increase

11  our cost of defense.  Riddell is certainly -- and no helmet

12  manufacturer would be in the position of other entities like

13  the NCAA or the NFL.  This kind of litigation has a real cost

14  to the company.  The longer it goes on, the more it costs.

15       It's very prejudicial.  It is very unfair.  It's

16  detrimental.  It's inefficient.  And then, if you look at the

17  interest of the Court and the other parties, it's certainly not

18  going to help them have an efficient MDL -- have running --

19       JUDGE BARBADORO:  You assert that it will be much more

20  expensive to you.  I'm not -- it's not clear to me why that is

21  so.  It seems to me there's substantial overlap in the kinds of

22  factual matters you would like to develop and the kind of

23  factual matters the NCAA would like to develop.  Clearly, there

24  are different concerns that you have, but aren't there

25  efficiencies to be obtained in doing these things together?

1    MR. CEREGHINI:  I really don't think that we're

2 looking at any significant overlap when you consider that the

3 NCAA is dealing with, you know, everything from field hockey to

4 wrestling.  And in a lot of these sports, helmets aren't even

5 used.  In football, helmets aren't used.  And so when we look

6 at just the practical aspect of -- I think there's been a

7 reference --

8    JUDGE BARBADORO:  The effect this has on young

9 people's brains is an issue that is very common, would be an

10 issue that you're going to have to resolve in the claims

11 against you.

12    MR. CEREGHINI:  But if we paint with that broad a

13 brush, Your Honor, then the effect that impacts have on brains

14 in automobile accidents, to soldiers, and to a lot of other

15 people, I mean, we could broaden --

16    JUDGE BARBADORO:  But the kind of impacts that one

17 experiences on the football field, which is a very significant

18 chunk of the class action claims here, are the very same issues

19 that you're going to be having to litigate in the claims

20 against you.

21    MR. CEREGHINI:  It's one of seven or eight sports that

22 are involved.  And I don't think anybody would take that

23 argument and say, 'Oh, we ought to consolidate the NFL claims

24 with the collegiate claims, with other claims.'  That is an

25 issue, but that's not an issue where there's sufficient overlap

1  to accept all of the other inefficiencies and the

2  inconvenience, the unnecessary costs that will occur just

3  experienced by Riddell.

4          And then, as I said at the inception, trying to funnel

5  into this litigation claims against two helmet manufacturers

6  would be very inefficient for the Court and the other parties.

7          JUDGE BREYER:  I'm trying to figure out why -- if it's

8  easier for the lawyer or for these individuals -- why you can't

9  make a decision -- if other cases are out there but all

10 consolidated and centralized in the same court, why you can't

11 then decide, 'I should participate in this.  I don't have to

12 participate in that.  This makes sense.  I want to do that.'

13 Tell the judge that, 'This is the direction we would like to go

14 in, and we should be treated separately because we're ready to

15 proceed, or ready to do this, or if we don't have to do that.'

16          I mean, that's one of the things MDL judges do all the

17 time, is that they don't -- they hear these different -- the

18 parties may be somewhat differently situated, and they try to

19 tailor the participation in pretrial matters according to the

20 concerns of the individual party that is in front of them at

21 the time.  And I don't -- I'm trying -- really, I am trying

22 understand your argument why you're prejudiced by it.  It's

23 more crowded?  You know, maybe --

24          CHAIRMAN HEYBURN:  I would think it would even be to

25 your advantage.  Your liability is derivative, it's not duress.

The NCAA is going to be looking to you if they have a problem.
I would think you'd -- there's certainly things you're going to
be monitoring anyway.  It's not as though you're not -- you
know, if you're not part of the MDL, you're gonna say, 'Oh,
that's good.  We don't have anymore liability.'

MR. CEREGHINI:  Well, let me answer it this way with a
couple examples.  I mean, we have only one claim against us
right now, it's in DuRocher.  We have nine others that did not
name Riddell or any other helmet manufacturer.

It could be that that one action in DuRocher is an
outlier, we're not going to see others.  We don't want to do
things that are going to encourage people to bring other claims
which, frankly, we feel are specious and frivolous.  And we're
concerned that, if we get roped into this kind of proceeding,
that then will lead to that sort of pleading.

CHAIRMAN HEYBURN:  Sure.  That's a legitimate concern.

MR. CEREGHINI:  And then secondarily, once we're
involved in actions like this, there are events that would go
on that otherwise we wouldn't have to be involved in.  Like, as
you referred to, Your Honor, the creation of a Master
Complaint.  We don't need a Master Complaint, there's only one
claim against us.  There has been already 300,000 pages of
discovery we've heard.  We can't very well, if we're involved,
not deal with that in some level of review.  We have different
obligations with respect to the motions.

1      And then there's the whole issue that things just

2  don't happen at our pace then.  We are at best the tail wagging

3  the dog, and so there's a risk that justice for Riddell and for

4  Kranos then would be delayed.

5      CHAIRMAN HEYBURN:  Thank you very much.

6      MR. CEREGHINI:  Thank you.

7      CHAIRMAN HEYBURN:  Mr. Toomey; is that right?

8      MR. TOOMEY:  Yes, Your Honor.

9      CHAIRMAN HEYBURN:  All right.  Do you feel the same

10  way?

11      MR. TOOMEY:  I do, Your Honor.  Maybe that's not

12  surprising.  But maybe what I'd like to address is why we

13  believe the Panel should not leave this issue to the Transferee

14  Judge.  And the reason it should not, in our view, is that the

15  issue is ripe now.  The Panel has the information necessary to

16  conclude that the claims against the product manufacturers and

17  the claims against the NCAA are apples and oranges.

18      Which helmet a player wears or was wearing, how was

19  the helmet designed, how did it perform, how did it fit, was it

20  new, was it reconditioned; these are only a few of hundreds of

21  issues that are going to be relevant to the product liability

22  cases that have nothing to do with whether the NCAA properly

23  governed college athletics or not.

24      The documents pertaining to the product liability

25  cases are going to be different, the fact witnesses are going

1  to be testifying to different issues.

2         CHAIRMAN HEYBURN:  Let me ask this.  As a practical

3  matter, so we have the Indiana case is the only one where --

4  are you named in that case, as well?

5         MR. TOOMEY:  We are named.  That's the only case that

6  Kranos is named in, yes.

7         CHAIRMAN HEYBURN:  So what you're asking us to do, we

8  would centralize -- if we did -- we'd centralize all the cases

9  and we'd leave whatever case there is against you, we'd leave

10  that in Indiana.

11         MR. TOOMEY:  Yes.

12         CHAIRMAN HEYBURN:  Is that a products liability case?

13         MR. TOOMEY:  It is.  And these are garden

14  variety product liability cases.

15         CHAIRMAN HEYBURN:  So someone who's actually been

16  injured, or people who have actually been injured.

17         MR. TOOMEY:  That's the claim as we understand it.

18  With this case, it's very new, responsive pleadings haven't

19  even been filed yet, but that's the way we understand it, yes.

20         CHAIRMAN HEYBURN:  And so how many -- I'm sorry to get

21  into the details -- but how many Plaintiffs are there in the

22  Indiana case?

23         MR. TOOMEY:  There are three named Plaintiffs, none of

24  whom played football after 2010, which is important for Kranos

25  because we didn't even exist until December, 2010.

1        CHAIRMAN HEYBURN:  But the allegation is that they
2   currently suffer some injury -- some head injury.

3        MR. TOOMEY:  Yes.  They all sustained blows that
4   were --

5        CHAIRMAN HEYBURN:  So a medical monitoring situation,
6   although that might be involved, this is an alleged actually
7   injury.

8        MR. TOOMEY:  That's correct.  That's correct.  The
9   only other thing I'd like to point out, I guess, is that the
10  NCAA mentioned that it might at some point try to rope in the
11  helmet manufacturers.  Well, in the last two years that
12  Arrington has been pending, that hasn't happened.

13       So to say this might happen -- who knows what might
14  happen, all we know is what has happened.  And right now, what
15  has happened is the Plaintiff has pled claims against the
16  helmet manufacturers that are apples, and claims against the
17  NCAA that are oranges.

18       CHAIRMAN HEYBURN:  Are there -- but there are separate
19  non-products liability claims before Judge Barker against the
20  NCAA.

21       MR. TOOMEY:  Against the NCAA, yes.

22       CHAIRMAN HEYBURN:  All right.  Thank you.  All right.
23  Miss Fegan.  I'm going to ask Mr. Mester, also, if he has any
24  final words after this.

25       MS. FEGAN:  I think I just have three points.  First,

1 some of my brethren said that we didn't pick up discovery
2 pre2004, and that's just not true.  Our discovery has been
3 extensive, and has been submitted to the Court, and review of
4 the proffer facts that we submitted would show that we dealt
5 far back into the NCAA's knowledge and failures.

6          That being said, our Second Amended Complaint does
7 contain accurate fact definition that is not limited by time.

8          But what we did do was we put our best foot forward in
9 our motion for class certification.  And so we have not
10 abandoned those claims, but we have taken our best shot at this
11 point in time.

12          JUDGE BREYER:  Does it make sense -- if we centralize
13 someplace other than Illinois, does it make sense to not bring
14 you along with it, leave you where you are?

15          MS. FEGAN:  I don't think it does.  I think, because
16 either two things are going to happen in our case.  One, Judge
17 Lee is going to decide a motion for class certification, which
18 subsumes all of the other cases out there, or two, we're going
19 to resolve the case and subsume all the other cases that are
20 out there.  And I imagine everyone is going to want to
21 participate either as an objector or opt-out and they're both
22 claim free.

23          JUDGE VANCE:  I thought the medical monitoring claim
24 excluded 18 jurisdictions, or it only included 18
25 jurisdictions; is that correct?

1          MS. FEGAN:  Your Honor, yes.  To what was submitted to
2    the Court was an analysis and demonstrated those 18 states
3    either recognize medical monitoring as an independent cause of
4    action or as a remedy for negligence.

5          JUDGE VANCE:  But is that the class you're alleging?

6          MS. FEGAN:  No.  Our class is broader than that, but
7    our current motion for class certification has narrowed it
8    because we wanted to put our best foot forward and try to
9    get --

10          JUDGE VANCE:  So you're asking to certify a class that
11    only includes --

12          MS. FEGAN:  Those 18 states --

13          JUDGE VANCE:  -- those 18 states.

14          MS. FEGAN:  -- right, that recognize medical
15    monitoring.

16          JUDGE HUVELLE:  So if someone had been hurt, where
17    would they fall in your class --

18          MS. FEGAN:  Well, we have the second class.  Medical
19    monitoring -- I didn't mean to interrupt you.  Our second class
20    is the 50-state core issues class.  And what we have for that
21    is we are going to be asking the Court to certify the issues of
22    the NCAA's duty to protect the health and welfare of the
23    student athletes, as well as the NCAA's breach at failure to
24    implement this --

25          JUDGE HUVELLE:  But that's part of the medical class

1 certification only --

2          MS. FEGAN:  Yes, it is.

3          JUDGE HUVELLE:  So you've asked for two different

4 classes --

5          MS. FEGAN:  That's correct.

6          JUDGE HUVELLE:  -- and that's part of the same

7 motion --

8          MS. FEGAN:  It is.

9          JUDGE HUVELLE:  -- argument before Judge Lee?

10          MS. FEGAN:  That's right.

11          JUDGE HUVELLE:  And so you've had discovery on both

12 class allegations.

13          MS. FEGAN:  Absolutely.  So full-time period class

14 discovery -- or discovery as well as -- the witnesses have all

15 been deposed.  The idea that convenience is best served by

16 going to Indianapolis makes little sense, but the witnesses

17 have already been deposed, we've already flown all over the

18 country.  All the witnesses were not located in Indianapolis.

19 So at this point --

20          JUDGE HUVELLE:  If there's a settlement, will your

21 class be earlier than 2010?  Do you know?  I mean, is that --

22          MS. FEGAN:  That is open to negotiation, Your Honor.

23 I know the NCAA would like full peace.

24          JUDGE HUVELLE:  I'm sure they would.

25          MS. FEGAN:  Yes.  Thank you.

1      CHAIRMAN HEYBURN:  Wait.  So, and how these other

2  cases -- I guess, there are what?  Seven or eight?  How many

3  cases are there now?

4      MS. FEGAN:  If you count the two that were originally

5  filed, there's 11.

6      CHAIRMAN HEYBURN:  11.  So the class that you are

7  proposing is consumed -- or consumes many of the claims in the

8  other cases, but not all of them.  Is that fair enough?

9      MS. FEGAN:  That's fair.  Although they are on behalf

10 of all of the main people that we have, they all seek medical

11 monitoring, and all for the same injury.

12     CHAIRMAN HEYBURN:  So no matter where -- if we

13 centralize, no matter where we centralize, some judge is going

14 to have to sort of make sense of where we go from here, which

15 wouldn't mean that part of it couldn't be settled pursuant to

16 your class, and then there would be litigation over the other

17 classes.

18     MS. FEGAN:  That's absolutely right.  And actually --

19     CHAIRMAN HEYBURN:  That would be a possibility.

20     MS. FEGAN:  Yes, absolutely.  And Judge Lee actually

21 recognized at our last hearing about a month ago, he had -- we

22 were asking him to stay the petition to intervene that was

23 pending there, and he said, "No.  I'm going to go ahead.  Let's

24 get fully briefed, because the Transferee Judge is going to

25 have to deal with it" --

1    CHAIRMAN HEYBURN:  Some judge is going to have to deal
2  with it.

3    MS. FEGAN:  -- exactly, exactly.  Thank you.

4    CHAIRMAN HEYBURN:  Mr. Mester, would you like to add
5  anything?  There are a lot of people telling us what they think
6  you'll do.

7    MR. MESTER:  Yes, Your Honor.  First, I've got to talk
8  to my colleague about the difference between a Ranger or
9  Sheriff.

10    I do want to clarify one remark.  We haven't named or
11  made any effort to bring in the helmet manufacturers.  What we
12  did do is assert as an affirmative defense the failure to join
13  parties.  And our view is that that's one of the many
14  impediments of certification of the proposed classes; the
15  failure and, in fact, inability to join all the entities you
16  deem to have there for a full adjudication.  I want to make
17  that clear.

18    Having said that, we do think the Transferee Judge
19  probably is best suited to decide the severance issue and how
20  those claims get addressed.  To the other question --

21    CHAIRMAN HEYBURN:  On that particular point, right now
22  there's just the one case in Indiana.  So in theory, as far as
23  you're concerned, it's sort of either here nor there.  If we
24  centralize, we can centralize all the cases, leave the helmet
25  cases in Indiana, and whatever happens, happens.

1          MR. MESTER:  That's absolutely right.

2          On this other question, Your Honor, your suspicion was

3  correct.  We would want to use the broadest possible settlement

4  class.  We do believe that the operative -- we indicate in our

5  papers -- the operative pleading in Arrington, which is the

6  Second Amended Complaint, has never been amended.  We believe

7  that is the operative definition of the class, and that is the

8  broadest.  I believe that definition subsumes all the classes

9  in all the cases.

10          JUDGE HUVELLE:  It's possible that if a settlement

11  were reached in Arrington, you would be settling your part of

12  the Southern District of Indiana, as well --

13          MR. MESTER:  Absolutely, Your Honor.

14          JUDGE HUVELLE:  -- leaving the helmet people by

15  themselves --

16          MR. MESTER:  Absolutely, yes.

17          JUDGE HUVELLE:  -- unless they join the settlement.

18  Okay.

19          CHAIRMAN HEYBURN:  Thank you very much.  You've been

20  very instructive.  We'll take the matter under submission.

21          (Matter adjourned at 1:17 p.m.)

22

23                    *       *       *

24

25

# C E R T I F I C A T E

I hereby certify that the foregoing matter is transcribed from the stenographic notes taken by me and is a true and accurate transcription of the same.


    /s/ Ellen L. Ford            Dated:  December 16, 2013
ELLEN L. FORD, CCR No. 846